**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

CLINTON FAIR,

      Plaintiff,

v.                                Case No:  6:15-cv-1133-Orl-40DCI

JONATHAN MILLS and
THE CITY OF ORLANDO,

      Defendants.
_____

## <u>ORDER</u>

      This cause comes before the Court without oral argument on Defendant Jonathan Mills' Motion for Partial Summary Judgment (Doc. 42) and Defendant City of Orlando's Motion for Summary Judgment (Doc. 43).  The parties have completed their briefing and the Court is otherwise fully advised on the premises.  Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and memoranda of the respective parties, the Court will grant the City of Orlando's motion and deny Jonathan Mills' motion.

## I.    BACKGROUND

      On August 12, 2014 at 10:41 a.m., the Orlando Police Department ("OPD") issued a "be on the lookout" ("BOLO") for a "rusty grey Toyota Corolla with no tint, four door . . . occupied by a black male named Jeremiah Fillmore." (Doc. 57-2).  Around this time, Plaintiff, Clinton Fair ("Fair"), was a passenger in a silver Nissan Sentra being driven by his friend.  (Fair Dep. 66:23–67:8).  Sergeant Paul Griffith ("Sergeant Griffith"), an OPD officer who was on duty when the BOLO was announced, saw the car in which Fair was

a passenger and, believing that both the car and Fair[1] matched the description given by the BOLO, conducted a traffic stop.  (Griffith Dep. 6:17–23, 8:1–9:4).  Defendant, Officer Jonathan Mills ("Officer Mills"), another OPD officer who was on duty at the time, encountered Sergeant Griffith performing the traffic stop and, although he did not know why Sergeant Griffith initiated the stop, pulled over to assist.  (Mills Dep. 38:7–24).  As the officer leading the investigation, Sergeant Griffith obtained both the driver's and Fair's identification and ultimately determined that neither was the suspect described in the BOLO.  (Griffith Dep. 13:12–14:5).

Although the initial reason for the traffic stop had ended, the officers continued to investigate.  Upon returning the driver's identification, Sergeant Griffith asked if he could search the vehicle, to which the driver answered no.  (*Id.* at 15:3–6).  On the opposite side of the car, Officer Mills asked Fair if he had anything illegal on him, to which Fair also answered no.  (Mills Dep. 68:5–11).  Officer Mills then opened the passenger-side door and ordered Fair to exit the vehicle and to place his hands on the roof of the car.  (Fair Dep. 77:16–78:14).  Fair complied.  (*Id.* at 80:5–81:18).

As soon as Fair placed his hands on the roof of the car, Officer Mills started searching Fair's person.  (*Id.* at 83:13–18).  Officer Mills began by grabbing and pulling on Fair's penis and testicles, to which Fair instantly objected and informed Officer Mills that he did not consent to be searched.  (*Id.* at 85:11–16).  Officer Mills thereafter proceeded to search Fair's waist and buttocks.  (*Id.* at 85:17–23).  When Officer Mills attempted to use his hand to spread Fair's buttocks apart, Fair tensed up and froze.  (*Id.*).  Officer Mills then used his body to press Fair against the side of the vehicle and

---

[1]   Fair is a black male.  (Fair Dep. 145:5–17).

demanded to know what Fair was hiding in his anus.  (*Id.* at 85:24–86:2).  In shock, Fair responded that he did not understand why Officer Mills was acting this way and that he did not consent to be searched.  (*Id.* at 86:3–16).  Officer Mills then informed Fair that he was being detained, placed him in handcuffs, and walked Fair back to his patrol car.  (*Id.* at 98:13–24, 100:12–16).  While standing next to the patrol car, Officer Mills searched Fair again by shoving his hand down the back of Fair's shorts, forcefully spreading Fair's buttocks apart, and penetrating Fair's anus with his finger.[2]  (*Id.* at 102:7–103:21).  Upon finding no contraband, Officer Mills walked Fair back to his friend's car and removed the handcuffs.  (*Id.* at 119:21–120:10).  Fair and the driver were subsequently released.

Pertinent to this Order, Fair sues Officer Mills pursuant to 42 U.S.C. § 1983 for violating his federal constitutional rights under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures and from the use of excessive force.[3]  Fair additionally sues the City of Orlando (the "City") under § 1983 for permitting a culture of constitutional violations at OPD and for not taking corrective action against Officer Mills when it had the opportunity.  Officer Mills and the City now move for summary judgment on these claims.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must "cit[e] to

---

[2]   Fair testified at his deposition that he is unsure whether Officer Mills used one or more fingers to perform the body cavity search, but is certain that Officer Mills penetrated his anus with at least one finger.  (Fair Dep. 116:24–117:21).

[3]   Fair also alleges state law causes of action against Officer Mills for battery and false arrest; however, Officer Mills does not move for summary judgment on these claims.

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials," but may also consider any other material in the record.  Fed. R. Civ. P. 56(c)(3).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*  The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).  In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor.  *Skop v. City of Atlanta*,

485 F.3d 1130, 1136 (11th Cir. 2007).   Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.   DISCUSSION

### A.   Officer Mills' Motion for Summary Judgment

Officer Mills moves for summary judgment as to Count II of the Amended Complaint on the ground that he is entitled to qualified immunity on Fair's § 1983 claims. Officer Mills asserts that Fair cannot prove the violation of a constitutional right.[4]

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)) (internal quotation marks omitted).   A government official acts within his discretionary authority when he "perform[s] a legitimate job-related function . . . through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).   "Once the defendant establishes that he was acting within his discretionary authority, the burden

---

[4]   Officer Mills also moves for summary judgment on the ground that Fair alleges his § 1983 claims against him in his official capacity only and that, as a result, these claims are duplicative of Fair's § 1983 claims against the City. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (reiterating that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [government] entity"). However, the caption of Fair's Amended Complaint and allegations incorporated by reference into Fair's § 1983 claims against Officer Mills indicate that Fair sues Officer Mills in his individual capacity.   (*See* Am. Compl. ¶¶ 11, 45).   The Court will therefore not grant summary judgment on this basis.

shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.  To do so, the plaintiff must demonstrate that the facts of the case, if proven true, would make out the violation of a clearly established constitutional right.  *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016).

Here, the parties agree that Officer Mills was acting within his discretionary authority when he assisted Sergeant Griffith in the traffic stop and searched and seized Fair after ordering him out of the vehicle.  The burden therefore shifts to Fair to demonstrate that Officer Mills violated his clearly established constitutional rights.

To that end, the Court finds it helpful to first characterize the nature of the constitutional violations in dispute.  As alleged in the Amended Complaint, Fair conceivably asserts that Officer Mills violated his constitutional rights in five discrete ways: (1) by ordering Fair out of the vehicle, (2) by conducting a pat-down search of Fair's person, (3) by seizing and detaining Fair in handcuffs, (4) by conducting a body cavity search, and (5) by employing excessive force against Fair.  In his motion for summary judgment, Officer Mills concedes that he cannot prove qualified immunity at this point with respect to Fair's body cavity search and excessive force claims.  Additionally, in his response to Officer Mills' motion, Fair concedes that Officer Mills acted lawfully when he ordered Fair out of the vehicle.  The Court accordingly limits its analysis to whether Officer Mills is entitled to qualified immunity for the pat-down search and for placing Fair in handcuffs.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles

that fall short of traditional arrest."[5]  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  In the context of a legitimate traffic stop, a police officer can lawfully direct the driver or a passenger to exit the vehicle in order to conduct a brief and limited pat-down search for weapons as long as the officer has reasonable suspicion that the individual is armed and dangerous.  *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *United States v. Hollins*, 336 F. App'x 921, 922 (11th Cir. 2009) (per curiam).  Similarly, an officer must have reasonable suspicion that an individual is dangerous to justify the use of handcuffs during an investigatory stop.  *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305–06 (11th Cir. 2006).  While not as demanding of a standard as probable cause, reasonable suspicion requires the officer to have more than a hunch or a feeling that the individual poses a threat.  *Arvizu*, 534 U.S. at 274.  Indeed, a police officer who conducts a pat-down search or who applies handcuffs during an investigatory stop must be able to articulate specific, objective facts which, when considered with the totality of the surrounding circumstances, would cause a reasonably prudent person to believe that the individual is dangerous.  *United States v. White*, 593 F.3d 1199, 1202–03 (11th Cir. 2010).

Although a police officer who conducts a pat-down search or utilizes handcuffs during an investigatory stop without reasonable suspicion violates the Fourth

---

[5]  The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fourth Amendment's guarantees are made applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

Amendment, he is nevertheless entitled to qualified immunity from civil liability if he had arguable reasonable suspicion.[6]   *See Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion . . . ."). Arguable reasonable suspicion exists when a reasonable officer facing the same circumstances could have believed that he had reasonable suspicion to conduct a pat-down search or to use handcuffs.  *See Brent v. Ashley*, 247 F.3d 1294, 1303 (11th Cir. 2001).  "Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable."  *Whittier v. Kobayashi*, 581 F.3d 1304, 1309 (11th Cir. 2009) (per curiam).

Based on the record evidence, it is clear that arguable reasonable suspicion did not exist for a reasonable officer in Officer Mills' circumstances to believe that Fair was armed and dangerous.  At his deposition, Officer Mills testified that the only aspect of the situation which caused him to initiate[7] the pat-down search was his subjective belief that Fair appeared nervous.  (Mills Dep. 81:11–82:10, 84:9–18).  However, it is well-established that an individual's appearance of nervousness, without more, is not enough to form reasonable suspicion that the individual is dangerous.  *See, e.g.*, *Brent*, 247 F.3d

---

[6]   The Court notes that Officer Mills invokes the arguable probable cause standard to justify seizing and searching Fair.  However, arguable probable cause only applies in the context of a custodial arrest or circumstances tantamount to a custodial arrest.  *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).  Since Fair's alleged arrest is not at issue on summary judgment, arguable probable cause is not the proper standard.

[7]   Officer Mills also testified that, while he was searching Fair, Fair dropped one or both of his hands to his waist and that this action caused Officer Mills to conclude that Fair might have "bad intentions" toward him.  (Mills Dep. 99:14–100:22; *see also* Griffith Dep. 22:5–23:3 (stating that he saw Fair drop his hands to his waist while Officer Mills was conducting the pat-down search)).  However, logic dictates that, even if true, Fair's dropping of his hands to his waist *during* the pat-down search cannot form the basis for arguable reasonable suspicion to conduct the pat-down search in the first place.

at 1302, 1304–05 (11th Cir. 2001) (holding that "nervousness, standing alone, cannot provide 'reasonable suspicion,'" and finding that individual's nervousness was insufficient for a reasonable customs officer to have arguable reasonable suspicion to conduct search); *United States v. Tapia*, 912 F.2d 1367, 1371 (11th Cir. 1990) (finding that an individual's appearance of nervousness was not enough to amount to reasonable suspicion); *cf. United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) ("We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on the nervousness of either the driver or passenger as a basis for reasonable suspicion . . . must be treated with caution.") (citation and internal quotation marks omitted).

Ironically, the cases Officer Mills cites on summary judgment confirm that an officer must point to other objective facts in addition to an individual's nervousness to justify a pat-down search. *See United States v. Mosby*, 630 F. App'x 961, 964 (11th Cir. 2015) (per curiam) (affirming trial court's finding of reasonable suspicion where individual was present in high-crime area, acted nervously when police approached, and attempted to flee when asked for identification); *McCray v. State*, 177 So. 3d 685, 688 (Fla. Dist. Ct. App. 2015) (affirming trial court's finding of reasonable suspicion where individual appeared at a known drug dealer's home while police were conducting a search, hid his hand when officer approached him, and did not respond when asked if he had firearms or drugs in his possession); *Brown v. State*, 863 So. 2d 459, 461 (Fla. Dist. Ct. App. 2004) (affirming trial court's finding of reasonable suspicion to conduct pat-down search of passenger where officer observed the passenger "scrambling to hide something" in car).

In contrast, Officer Mills essentially admitted at his deposition that he had no reason aside from Fair's nervous behavior to believe that Fair posed a threat or was otherwise engaged in any type of illegal activity at the time he initiated the pat-down search:

> Q.   So when you first walk up to the passenger side window, your testimony is the purpose of you coming there was to be sure you were covering Sergeant Griffith?
>
> A.   Correct. There's no point in me being a cover officer or a backing officer if I hang out by my car.
>
> Q.   And by cover, you want to make sure [Sergeant Griffith is] safe?
>
> A.   Correct.
>
> Q.    . . . . You see any weapons inside the car?
>
> A.   I did not.
>
> Q.   Guns?
>
> A.   (Shakes head.) No.
>
> Q.   Knives?
>
> A.   No.
>
> Q.   Chains?
>
> A.   No.
>
> Q.   Pepper spray?
>
> A.   No.
>
>      . . . .
>
> Q.   Okay. Did you speak any other words to Clinton Fair before that other than the initial congenial conversation?
>
> A.   Yeah. I think I remember stating -- asking him if he had anything illegal on him.
>
> Q.   And what did he say?

A.   He said no.

Q.   And you didn't smell anything, correct?

A.   I did not.

Q.   You didn't see anything that looked like contraband, correct?

A.   I did not.

Q.   There wasn't smoke in the vehicle or anything like that, correct?

A.   No, not that I recall.

Q.   Did you have some reason to believe, before you first walked up to the passenger side window, that drugs were involved in this traffic stop?

A.   No.

Q.   Did [Sergeant] Griffith ever tell you this [traffic stop] was at all related to drugs?

A.   No.

Q.   Was there a bumper sticker or something on the vehicle that said something related to drugs or --

A.   Not that I recall.

Q.   I mean -- I mean, other than what you've described as something that appeared to you to be Mr. Fair being nervous, was there anything else that pointed to you that somehow drugs were involved with this vehicle or these people?

     [objection by counsel omitted]

A.   Not outside his nervous behavior, no.

(Mills Dep. 64:13–65:7, 68:5–69:11).  Officer Mills further testified that Sergeant Griffith never expressed any concern or anxiety about his own safety during the traffic stop or otherwise indicated that either the driver or Fair posed any sort of threat.  (*Id.* at 53:20–54:3).  In short, Officer Mills points to no objective fact, and the Court finds no objective

fact in the record, which would warrant a reasonable officer in the same circumstances to believe that Fair was dangerous at the time Officer Mills initiated the pat-down search, thus precluding arguable reasonable suspicion.

Similarly, the record evidence shows that arguable reasonable suspicion did not exist for a reasonable officer in Officer Mills' circumstances to handcuff Fair during the search.  In his motion for summary judgment, Officer Mills claims that he handcuffed Fair because he was conducting the pat-down search in the middle of the road near a lane of moving traffic during rush hour.  Officer Mills therefore argues that he handcuffed Fair out of concern for his personal safety and to specifically protect against the possibility of Fair pushing him into oncoming traffic.  However, Officer Mills is again unable to identify any objective fact which would warrant a reasonable officer in the same circumstances to believe that Fair posed a threat of shoving Officer Mills into traffic.  To the contrary, Officer Mills testified at his deposition that Fair obeyed his commands throughout the encounter and never resisted, which is inconsistent with the danger Officer Mills now asserts.  (*See* Mills Dep. 69:12–15, 70:18–71:2, 108:2–12).  Moreover, Fair testified at his deposition that Officer Mills applied the handcuffs only after Fair objected to Officer Mills searching his buttocks, implying that Officer Mills did not handcuff Fair out of concern for being pushed into traffic, but rather as a part of his ongoing search of Fair's person.  (Fair Dep. 97:25–98:17).  As a result, arguable reasonable suspicion did not exist to handcuff Fair either.

Because no reasonable officer in the same circumstances as Officer Mills could have believed that Fair was dangerous such that it was necessary to conduct a pat-down search or to use handcuffs, Fair carries his burden of demonstrating that Officer Mills

violated his clearly established rights under the Fourth Amendment.  Officer Mills is therefore not entitled to qualified immunity and his motion for summary judgment will be denied.

### B.    The City's Motion for Summary Judgment

The City moves for summary judgment as to Count I of the Amended Complaint on the ground that Fair cannot produce evidence demonstrating that the City is liable for Officer Mills' conduct.  Under § 1983, a municipality such as the City is only responsible for the unconstitutional conduct of its officers when the municipality itself caused the constitutional violation.  *Skop*, 485 F.3d at 1145.  A municipality causes a constitutional violation when it acts "pursuant to [an] official municipal policy of some nature."  *Monell v. Dep't of Social Servs. of NY*, 436 U.S. 658, 691 (1978).  Therefore, a plaintiff who intends to impose liability against a municipality must show a "direct causal link" between a municipal policy and his constitutional injuries.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Municipal policy can come in different forms.  Intuitively, the most obvious examples are officially promulgated ordinances, rules, regulations, codes, or a decision rendered by a policymaker.  *See, e.g.*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Monell*, 436 U.S. at 694–95.  Less-than-formal policies may subject a municipality to liability as well, such as when the plaintiff's constitutional injuries are caused by an unofficial custom or practice that is so well-settled, permanent, pervasive, and wide-spread "that it takes on the force of the law."  *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quoting *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999)).  Additionally, a municipality's failure to correct constitutionally violative

conduct may amount to a policy or custom "if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct." *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987). Ultimately, however, a municipality cannot be held liable under § 1983 for conduct of which its officials were unaware; instead, the plaintiff must show that municipal officials had actual or constructive knowledge of the misconduct, but that they failed to take corrective action. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).

The City submits that no official policy could have caused the constitutional injuries Fair alleges in this case. To that end, the City has produced copies of several official policies which are relevant to Fair's allegations, including OPD's policies on use of force, arrests, searches and seizures, and professional conduct. (*See* Docs. 45-2, 45-5, 45-6, 45-9). The City additionally maintains that it does not condone constitutionally offensive behavior and disciplines officers found to violate OPD's policies. (*See* Doc. 45-1, ¶¶ 12–13). In response, Fair agrees that the constitutional violations by Officer Mills were not caused by an official City policy. Rather, Fair contends that the City was aware that Officer Mills had a history of abusing constitutional rights, but failed to take corrective action.

Fair hinges his argument on what he says is a high volume of citizen complaints against Officer Mills. Specifically, Fair shows that, over the course of two-and-a-half years with OPD, Officer Mills was the subject of fourteen complaints, nine of which involved allegations of excessive force. (Doc. 57-6). Fair's police practices expert opines that such a large number of complaints in such a short period of time is "astonishing" and should have caused OPD to retrain, discipline, or terminate Officer Mills. (*See* Scott Dep.

78:14–24, 80:4–81:12; Scott Rpt. pp. 15–17).   Fair additionally shows that, as a result of these complaints, Officer Mills triggered OPD's Early Intervention Program[8] on three separate occasions, thus notifying OPD that Officer Mills was potentially violating citizens' constitutional rights.    (Doc. 57-7).    Notwithstanding these complaints and Early Intervention Program alerts, however, OPD determined that no disciplinary or corrective action was necessary.  Fair therefore concludes that the City either tacitly approved of or acted with deliberate indifference toward Officer Mills' pattern of misconduct.

Despite the seemingly high number of complaints against Officer Mills, Fair fails to demonstrate a genuine factual dispute over whether the City knew about Officer Mills' alleged misconduct.  The record shows that none of the complaints lodged against Officer Mills were substantiated and that, as a result, all three Early Intervention Program alerts required no remedial action.  (*See* Docs. 57-6, 57-7).  Further, while Fair alludes to the possibility that OPD's investigation of the complaints was nothing more than a rubber-stamp of Officer Mills' conduct, Fair cites no affirmative evidence which would allow a rational jury to make such an inference.  The sheer volume of complaints against Officer Mills is not enough to place the City on notice of Officer Mills' alleged pattern of misconduct where no complaint was found to have merit.  *See, e.g.*, *Brooks*, 813 F.2d at 1193 (finding that ten unsubstantiated complaints against police officer were insufficient

---

[8]   The Early Intervention Program is a mechanism through which OPD attempts to identify and assist officers who might not be performing their job-related functions as desired.  The Program works by alerting OPD when an officer has met certain criteria, such as receiving three supervisory referrals from citizen complaints within a three-month period or being involved in two or more police shootings.  OPD must then investigate the events which caused the alert, conduct an interview with the officer, and submit a report detailing findings and any recommended remedial actions.  The report is then reviewed by the officer's chain of command.  (*See* Doc. 45-4).

as a matter of law to provide notice to city).  Accordingly, the City is entitled to summary judgment on Count I.

IV.   **CONCLUSION**

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant Jonathan Mills' Motion for Partial Summary Judgment (Doc. 42) is **DENIED**.

2.  Defendant City of Orlando's Motion for Summary Judgment (Doc. 43) is **GRANTED**.  Summary judgment is granted in favor of the City of Orlando on Count I of Plaintiff's Amended Complaint.

**DONE AND ORDERED** in Orlando, Florida on December 12, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record